# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

# DIVISION II

| | |
|---|---|
| STATE OF WASHINGTON, | No. 56625-7-II |
| Respondent, | |
| v. | |
| ROBBRIE PURDELL THOMPSON, | UNPUBLISHED OPINION |
| Appellant. | |

GLASGOW, J.—Robbrie Purdell Thompson robbed a convenience store owned by Soon Ja Nam and Joseph Nam. Thompson shot Soon Ja[1] in the back when she ran from him. Thompson then pointed the gun at a customer while Joseph opened the cash register. Thompson took cash from the register and fled. Soon Ja died from her injuries.

Franklin Thuo drove Thompson to and from the convenience store. Two days after the robbery, police found Thuo's body on a beach with a bullet wound in the back of his skull. The bullets that killed Nam and Thuo were fired by the same gun.

The State charged Thompson with two counts of aggravated first degree murder of Soon Ja and Thuo, first degree felony murder of Soon Ja, first degree robbery, conspiracy to commit first degree robbery, and two counts of second degree assault of Joseph and the customer, all with firearm sentencing enhancements. The State also charged Thompson with second degree unlawful possession of a firearm.

---

[1] We refer to the Nams by their first names for clarity.

During voir dire, the State exercised a peremptory challenge against juror 35, defense counsel made a GR 37 objection, and the court allowed the peremptory challenge. The jury convicted Thompson of all charges, aggravating factors, and sentencing enhancements. The trial court dismissed the felony murder conviction on double jeopardy grounds and found Thompson indigent, but the court imposed several legal financial obligations.

Thompson appeals. He argues that the State's exercise of a peremptory challenge against juror 35 violated GR 37. Thompson asserts that he received ineffective assistance of counsel and that the trial court violated his right to present a defense. Thompson also argues that the prosecutor committed misconduct in opening and closing arguments and that defense counsel rendered ineffective assistance by failing to object. Thompson reasons that cumulative errors denied him a fair trial. And he argues that the State did not present sufficient evidence to convict him of second degree assault of Joseph. Finally, Thompson raises several issues related to a scrivener's error in the judgment and sentence and legal financial obligations, which the State concedes.

We affirm Thompson's convictions. But we accept the State's concessions and remand for the trial court to correct the scrivener's error and strike the challenged legal financial obligations from Thompson's judgment and sentence.

FACTS

I. BACKGROUND

Thompson and Thuo were friends who met early in high school. They both regularly bought and sold athletic shoes. When Thompson, who is Black, received his driving learner's permit in February 2019, he was 6'2" and 285 pounds. In April 2019, Thuo was approximately 6'1" and 250 pounds. Thuo was a sophomore and Thompson was a junior in high school. Thuo

was born in Kenya, and in April 2019 he shared a bedroom with a cousin who had recently moved from Kenya.

One Saturday in late April 2019, Thuo and his cousin left their house to go to the gym, both wearing blue sweatshirts. The cousin forgot his gym pass, so they parted ways; instead, Thuo drove a friend's car to pick up Thompson. They then drove to a convenience store in Puyallup owned by Soon Ja and Joseph, intending to rob the store.

The Nams were Korean, and English was not their first language. Soon Ja sometimes had problems opening the cash register and would seek out her husband or children for help.

The store had a residence in the back where the Nams lived. When the robbers entered the store, Soon Ja turned to go back into the residence to get Joseph to open the cash register. She was shot in the back and collapsed. Joseph went to the front to open the cash register.

Then, a longtime customer entered the store. As he was entering, the customer passed a stocky Black man slightly over six feet tall wearing a blue sweatshirt who was leaving the store. Inside, the customer saw another Black man at the counter who was taller and was wearing a dark gray or black sweatshirt. When the customer saw the man's hand in the cash register, he yelled and moved to tackle him. Joseph called out to the customer that the man had a gun, and the man then pulled a gun out of his sweatshirt and pointed it at the customer, who put his hands up and turned away. The man with the gun then left the store, he got into the passenger side of a car, and the car drove away. The customer called police.

Soon Ja was taken to the hospital where she was declared dead on arrival. She was 79 years old.

Police put out a bulletin for the description of the car and found it near Thuo's house the next day, on Sunday. Police searched Thuo's house but could not reach Thuo. On Monday morning, police found Thuo's body on tide flats at a marina in Tacoma with a bullet wound in the back of his head.

Thuo's body was fully dressed but wearing no shoes. Security camera footage from his home showed him leaving his house for the last time wearing a distinctive, expensive pair of white shoes. The next day, Thompson made a video advertising the shoes for sale.

The bullets that killed Soon Ja and Thuo were both .380 caliber and were fired from the same gun, but the gun was never found.

The State charged Thompson with aggravated first degree murder of Soon Ja and Thuo. This included aggravating factors that Soon Ja was murdered in furtherance of a first degree robbery, to conceal commission of a crime, and because Soon Ja was a potential witness. And the State also alleged that Thuo was murdered to conceal commission of a crime and because he was a potential witness. The State also charged Thompson with first degree felony murder of Soon Ja, first degree robbery, conspiracy to commit first degree robbery, second degree assault of Joseph, and second degree assault of the customer, all with firearm sentencing enhancements. The second degree assault charges alleged that Thompson assaulted Joseph and the customer under two alternative means: with a deadly weapon, and with intent to commit a felony. The State also charged Thompson with second degree unlawful possession of a firearm.

## II. VOIR DIRE

In voir dire, the prosecutor asked juror 35 a question about memory:

[PROSECUTOR]: If you hear different witnesses talk about the same or similar events, particularly in this case several years later, would you find it surprising if

4

their testimony was slightly different or different from other witnesses, or maybe even different slightly from what they may have said earlier? Would that surprise you?

JUROR NO. 35: Yeah, kind of.

[PROSECUTOR]: Okay. . . . If you were asked about something that happened two plus years ago, do you feel like you would feel just as comfortable now . . . to completely and accurately talk about it and give the details as you would have two years ago?

JUROR NO. 35: Yes.

[PROSECUTOR]: Can you think of other individuals that might have a challenge being able to remember precisely the same events two years later?

JUROR NO. 35: No.

Verbatim Rep. of Proc. (VRP) (Sept. 2, 2021) at 600-01. The prosecutor then asked several other jurors similar questions—those jurors responded that they would not be surprised by different recollections, that "memory is different for different people and can be somewhat unpredictable," and that personality traits and life experience may affect perception. *Id*. at 602.

The prosecutor then asked the jury panel about perspectives, using cars as an example, and juror 35 again responded. After stating that she liked Subarus and disliked Volkswagens, juror 35 stated that, if she were to watch each kind of car go by, she would be able to describe both cars with the same level of detail. Juror 43 also expressed an interest in cars but explained that people who were not familiar with cars may struggle to tell different models apart.

When defense counsel questioned the jury panel, they called on juror 35 because of her answers to the jury questionnaire where she said that she rarely changed her mind. Juror 35 said that in deliberations she would "go with what I know, and the evidence that I have heard" instead of the opinions of others. *Id*. at 667. But she said that she would be able to change her opinion.

The State exercised peremptory challenges against five jurors, including 35. All five jurors were 25 years old or younger; juror 35 was the youngest at 18. Thompson objected to the peremptory challenge against juror 35 under GR 37. Thompson asserted, and the trial court agreed, that juror 35 appeared to be a person of color, and possibly Black or mixed race. The GR 37 objection required the State to provide a race-neutral basis for the peremptory challenge.

The State expressed concerns about the effect of juror 35's youth on her perception of witnesses. One prosecutor was concerned about juror 35's ability to appreciate the fact that different people may remember different details of the same event, especially several years later. The other prosecutor emphasized that juror 35 "couldn't conceive of a bad memory or inconsistent statements," even with the passage of time. *Id*. at 692-93. "The specific time frame set forth was two years, which happens to be precisely the time frame at issue in this case, and she couldn't conceive that two years might diminish one's memory or result in inconsistencies between the statements over time, which is terribly relevant." *Id*. at 693.

The trial court was struck by how "immature" juror 35's answers about memory were. *Id*. at 694. It stated, "I don't think that her explanations were very convincing. I don't think she had a very good grasp of the memory-related issue and how it's possible that other people could have different versions of the same event," which the court noted was "critical" in a case like Thompson's that was "more than 800 days old." *Id*. at 694-95. The trial court observed that juror 35 was asked several questions about this issue, and that other jurors were asked similar questions and provided different answers. And the trial court found that the State had not disproportionately used peremptory challenges against any race or ethnicity.

The trial court denied the GR 37 challenge, stating, "I don't view an objective observer listening to the questions that were posed to [juror 35] *would* conclude that her race" contributed to the peremptory challenge. *Id*. at 694 (emphasis added). It ruled that juror 35's "lack of insight into her reasons why people would have potentially different memories of the same events" and the concerns about her ability "to work with a group in a jury to determine whether or not her opinion could be changed" were race-neutral reasons for removing her from the jury pool. *Id*. at 695.

After the jury was empaneled, the State supplemented the record by noting that two seated members of the jury appeared to be Black, one was Native American, one was Filipina, and another was possibly Latinx. The State also noted that it had used another peremptory challenge on a 19-year-old White woman.

### III. TRIAL

Overall, the State's theory of the case was that Thompson shot Soon Ja while Thuo was the getaway driver, and that Thompson later killed Thuo to keep him from confessing once police linked Thuo to the car used in the robbery. In contrast, Thompson admitted to being involved in planning the robbery, but he insisted that he left the store to serve as the getaway driver before Soon Ja was killed. And he claimed that someone else shot Thuo at the marina, although he would not say who.

A.      Opening Argument

The State began opening argument by emphasizing the varied backgrounds of the people affected by the two shootings:

> During the course of this trial the State expects that you'll hear, under oath,
> and from people who before April 27, 2019, didn't know each other; people who

came from as far away as Africa and Asia and as close as Puyallup; people who are old, and young and in between; people of African and European nation decent; people who through a chain of connections were brought to an intersection of time and space in which their lives were forever changed and in at least two cases ended when the defendant fired two bullets.

VRP (Sept. 8, 2021) at 10. The State returned to this theme at the end of opening argument:

In the end, the State expects the evidence to show that a child from Kenya, a Korean-American couple who kept a shop in Puyallup for decades, [and a] Latino contractor out buying beverages for a family get-together were all connected, and that bullets fired by the defendant from his .380 caliber pistol affected all of them, changed their lives forever, and in at least two cases, ended their lives forever.

*Id*. at 39. Defense counsel did not object to the State's discussion of witnesses' ethnic backgrounds.

In Thompson's opening, counsel argued that Thuo was the one who shot Soon Ja and someone else was responsible for Thuo's death.

B.    Evidence Presented

1.    Evidence about Thompson's arrest

One of the officers who arrested Thompson testified about the arrest. The officer explained that a SWAT team arrested Thompson in a rideshare minivan on his way to school. He stated that police cut off the minivan and pinned it between two police vehicles, then they broke the windows "to ensure access and [as] an anxiety manipulation tactic" and used "a noise-flash diversion device," more commonly known as a flash-bang grenade. VRP (Sept. 16, 2021) at 1360. The prosecutor then asked about the tactics used:

[PROSECUTOR:] What was the reason for having to break the window or taking that type of protocol, if you know?

[OFFICER:] One was just the threat matrix. Before we conduct any type of this operation, we're briefed on what the threat matrix is. And all the tactics are based off of the threat of the individual. We were briefed on the suspected crimes of Mr. Thompson, and that was what led down to a SWAT vehicle takedown rather than, say, a traffic stop by a marked unit.

8

> [PROSECUTOR:] Would it be accurate to say the goal would be to be quick, effective, and minimize any type of delay or interaction?
>
> [OFFICER:] Yes, ma'am. We were also very concerned [about] making this happen prior to him arriving to the school grounds.

*Id*. at 1361. Defense counsel did not object to this testimony. And on cross-examination, defense counsel asked why a SWAT team was called to arrest Thompson:

> [DEFENSE COUNSEL:] [I]t's not uncommon for the SWAT team to assist with an arrest, is it?
>
> [OFFICER:] I guess . . . I would say it is fairly uncommon. There's a lot of arrests that happen, and not very many of them reach the number of points on a threat matrix to call the SWAT team and to have that happen.
>
> [DEFENSE COUNSEL:] On the threat matrix, is that because of the type of crimes or charges that . . . he was suspected of committing? Is that where it comes from?
>
> [OFFICER:] In this case, specifically, I believe so. Yes, ma'am. But it also takes into a suspect's past, arrest history, and past crimes. I don't know if Mr. Thompson had any past record or not.

*Id*. at 1363-64.

The State then called another member of the SWAT team to testify about the arrest. The trial court interjected and excused the jury. The trial court then warned the State, "[t]he fact of arrest has little relevance" and testimony about law enforcement's threat assessment was "very dangerous territory." *Id*. at 1367-68. The State explained that it was trying to connect a phone found in the van to Thompson, which the court agreed was relevant. But the court cautioned, "I don't think we need to hear about the arrest any longer." *Id*. at 1370.

Defense counsel then sought to "adopt as an objection by the defense those remarks made by the Court." *Id*. at 1370-71. The trial court told defense counsel that it would consider a curative instruction if counsel proposed one.

9

Back in the presence of the jury, the officer explained that police found a backpack and phone near where Thompson had been sitting in the van.

At a break, defense counsel asked for "time to reflect" on whether to propose a curative instruction because the instruction could "be more damaging than not, because it highlights the testimony." *Id*. at 1378. Several days later, counsel decided not to propose a curative instruction because they thought "it would draw too much attention, particularly given the time that's passed since the testimony was offered." VRP (Sept. 21, 2021) at 368.

2.      Robbery, assaults, and Soon Ja's murder

Joseph did not testify at trial, and no witness testified that a gun was ever pointed at Joseph.

An officer who took Joseph's statement while paramedics tended to Soon Ja testified that Joseph was "in shock" after the robbery. VRP (Sept. 14, 2021) at 989. "He started saying that someone had shot his wife in front of him, and he just didn't comprehend what was happening to her. He didn't understand why that happened." *Id*. at 990. "[H]e was more concerned about what was going to happen to his wife" than discussing the robbery. *Id*. The officer stated that Joseph said Soon Ja "came into the back" and asked him "to open the cash register, and then she got shot and then she dropped to the ground. And he went to the front and opened the cash register." *Id*.

The customer who arrived in the middle of the robbery maintained that the man who walked out of the store before he entered was smaller and wearing a blue sweatshirt, while the man at the counter with the gun was taller, heavier, and wearing a black or gray sweatshirt. And the State presented photos from the security camera at Thuo's home showing him wearing a blue sweatshirt before the robbery and returning that evening wearing a Seahawks jersey and carrying the blue sweatshirt.

10

The customer testified that the gun Thompson pointed at him was small enough to fit in the palm of his hand. The State also presented photos and videos recovered from Thompson's phone, including a Snapchat video made shortly before the robbery, which showed Thompson holding a .380 caliber Taurus handgun, which is about the size of a person's palm. And the cousin who shared a room with Thuo testified that Thuo did not own a gun, and Thuo's father testified that no one in their household owned guns. Although the Taurus was never found, the State also presented messages from Thompson's phone seeking to sell his "380" the morning after the robbery, and again after Thuo's murder. Ex. 1397, 1440.

3.      Thuo's murder

Thompson had a girlfriend at the time of the murders. At trial, portions of her interview with police were played or read to the jury and the girlfriend testified that her statements to police were accurate and truthful. The girlfriend told police that Thompson said that Thuo killed Soon Ja. But Thompson feared that Thuo would talk to police, and Thompson told his girlfriend that he was going to kill Thuo to keep him quiet.

The State submitted texts recovered from Thompson's phone where Thompson's girlfriend told him not to "do anything stupid" on Sunday night while Thompson responded, "[Y]ou just gotta look at it from my side." Ex. 1413. She later told him, "[I] jus[t] don[']t get it" and said that she would not go to sleep until he told her that he wasn't going to "do it." Ex. 1415. The day after Thuo's murder, the girlfriend texted Thompson asking how he "did what we talked ab[ou]t." Ex. 1431. Thompson told her that she needed to learn "what not to say on iMessage" because the messages would be saved even if she deleted them. Ex. 1433.

The girlfriend told police that two days after Thuo died, Thompson admitted that he had killed Thuo. Thompson told her that he and Thuo went to the marina with others, and Thompson took out one of his earrings and pretended to lose it so that Thuo would bend down and look for it. Thompson then put a gun in a plastic bag and shot Thuo in the back of the head while Thuo was bent down. The medical examiner who performed Thuo's autopsy testified that he was shot in the back of the head with a gun that "was in contact with the body at the time it was fired." VRP (Sept. 16, 2021) at 1323. There was less soot in the wound track than usual, which suggested that some material had blocked some of the soot, and there was no hole in Thuo's clothing to indicate that he had been shot through his sweatshirt hood.

4. Other suspect evidence

Thompson repeatedly tried to introduce evidence that other people were at or near the marina the night Thuo was killed. Defense counsel elicited testimony from a detective that police contacted several of Thompson's known associates, but "they either wouldn't return a call or just refused to speak." VRP (Sept. 22, 2021) at 1411. When defense counsel inquired further about the extent of the investigation, the State objected and explained outside of the jury's presence that two of the people named had hired counsel, which was improper for the detective to testify about.

Outside the presence of the jury, the detective stated that police learned about four people who were associates of Thompson. He did not know whether Thuo knew those four people. Two of those people "may have been involved" in Thuo's murder, and at least one of them was represented by counsel. *Id*. at 1429. The trial court allowed defense counsel to ask whether the four people cooperated with the investigation, but barred inquiry about why they were not investigated further. The detective then testified that the four people did not cooperate with police.

A different detective testified about information retrieved from Thompson's phone. The detective testified that the phone was likely turned off between 10:00 p.m. and 12: 00 a.m. on the night Thuo was murdered. The detective surmised this because delivery of a text message from Thompson's mother was delayed. But he did not testify about any evidence that Thompson's phone was at the marina the night Thuo died.

On cross-examination, defense counsel asked if the detective had gathered any cell phone information from the marina and the State objected. Outside the presence of the jury, the State explained that there was evidence that one of Thompson's associates was near the marina the night of the murder, but that person was represented by counsel and the State had "no nexus whatsoever to indicate that he participated in this offense." VRP (Sept. 23, 2021) at 1659.

The trial court explained that, to introduce other suspect evidence, "there needs to be some evidence suggesting another suspect committed the charged offense. The defendant must show a train of facts or circumstances that can clearly point out that someone besides the defendant is the guilty party." *Id*. at 1665.

Later, the trial court similarly excluded additional evidence of videos and messages that purportedly placed other people near the marina around the time of Thuo's murder.

5.      Thompson's testimony

Thompson testified at trial. He acknowledged that he owned the phone recovered from the minivan he was arrested in.

Thompson claimed that the robberies were Thuo's idea. He testified that Thuo owned a Taurus handgun and was carrying it when they entered the convenience store. Thompson said that he was carrying an unloaded Glock, and that he dropped the clip for that gun when they entered

the store, panicked, and ran out to the car before they interacted with anyone inside the store.[2]

Thompson testified that he drove away from the store but did not know the way home, so he returned to the store to find Thuo hiding outside waiting for him. He picked Thuo up and then left. Thompson said Thuo claimed to have shot Soon Ja.

Thompson also testified that he and Thuo went to the marina with others on Sunday night, and that they were walking back to the car with Thuo walking behind Thompson, when someone else shot Thuo. He asserted that the gun used to shoot Soon Ja was not the same gun used to kill Thuo. Thompson asserted that videos of him with the Taurus handgun and the messages from his phone were created because he was "trying to help" Thuo sell the gun. VRP (Sept. 29, 2021) at 2071. But some of these message exchanges took place after Thuo's death.

During a break in cross-examination, outside the jury's presence, the State asserted that it expected Thompson to refuse to identify who he claimed shot Thuo, so asking would be "a futile question." *Id*. at 2034. Defense counsel then argued that Thompson's testimony that he was at the marina with others opened the door to the previously excluded other suspect evidence. The trial court ruled that the State had not opened the door. Defense counsel then asserted that barring Thompson from saying he knew who shot Thuo violated Thompson's right to present a defense. But the trial court rejected this argument.

Outside the jury's presence, Thompson refused to identify who shot Thuo, stating, "I think they would kill me if I tell you." *Id*. at 2048. Defense counsel then made an offer of proof, asserting that Thompson might testify consistent with the excluded cell phone evidence that two of

---

[2] Police found a magazine for a .357 caliber Glock in the store, as well as a .357 Glock and another magazine in Thompson's closet. The Glock magazine from the store, and the cartridges from that magazine had no identifiable fingerprints on them.

Thompson's associates were at the marina. But Thompson refused to identify who was with him at the beach.

As for the excluded cell phone evidence placing Thompson's friends at the marina, the trial court explained that it would require more evidence than possible geographic proximity to Thuo's body before it would admit other suspect evidence. The trial court again refused to admit the cell phone evidence that others were at the marina during Thuo's murder.

C.       Jury Instructions, Closing Arguments, and Verdict

The jury instructions explained that a person commits second degree assault when they "assault[] another with a deadly weapon or assault[] another with intent to commit a felony." Clerk's Papers (CP) at 100. "An assault is an act done with the intent to create in another apprehension and fear of bodily injury, and which in fact" does so even if the actor did not "actually intend to inflict bodily injury." CP at 103.

The instructions provided that to convict Thompson of second degree assault of Joseph, the jury had to find that Thompson assaulted Joseph "with a deadly weapon" or "with intent to commit robbery in the first degree." CP at 101. The jury did not have to be unanimous as to which of the alternative means applied, as long as each juror found that one of the means had been proved beyond a reasonable doubt.

During closing argument, the State briefly raised the theme of connections discussed in opening argument before turning to the jury instructions and evidence presented. The State returned to its theme a final time at the end of closing argument:

> That gun [w]ielded by the defendant connected and shattered lives of people who never knew how connected they were. We can choose to focus on our differences, on the thing that divide us, but, ultimately, that single gun connected a Korean-American immigrant who kept a store in Puyallup; a Kenyan-American

15

boy, grades weren't the best, but he was doing everything he could going to improve himself, going to mentoring sessions and going to church; a Latino-American contractor who is just picking up drinks for his family. Their lives are forever changed, if not ended, by the bullets that this defendant fired.

VRP (Sept. 29, 2021) at 2148-49. Defense counsel did not object to these comments.

Thompson's counsel conceded in closing that Thompson was guilty of felony murder of Soon Ja because she was killed during a robbery he participated in. Thompson also conceded guilt of second degree unlawful possession of a firearm and conspiracy to commit a robbery. But counsel maintained that Thuo was the person who shot Soon Ja, committed the actual robbery, and pointed a gun at the customer. And counsel asserted that there was no direct evidence that Thompson killed Thuo.

The jury convicted Thompson of all charges and firearm sentencing enhancements. It entered special verdicts finding the alleged aggravating factors. The jury found that Thompson murdered Soon Ja in furtherance of a first degree robbery. It also entered special verdicts finding that Thompson murdered Thuo to conceal commission of a crime and that the murder was related to the fact that Thuo was a potential witness. Finally, the jury unanimously found that Thompson was armed with a firearm when he committed all of the crimes.

### IV. SENTENCING

At sentencing, the trial court stated it was dismissing Thompson's conviction for felony murder of Soon Ja on double jeopardy grounds. The court identified the standard range for each of Thompson's aggravated first degree murder convictions as "25 years to a term less than *de facto* life in prison" under the case law. CP at 202. Defense counsel requested an exceptional downward sentence totaling 25 years based on Thompson's youth. The State requested a sentence of 45 years

on each aggravated murder count, to run concurrently with each other and all the other counts and firearm enhancements.

The trial court, after an extensive discussion of the background juvenile sentencing caselaw, found that youth did not contribute to Thompson's offenses. The trial court imposed concurrent sentences of 40 years for each of the aggravated murder counts, and ran those sentences concurrent to all of the other counts and firearm sentencing enhancements "to avoid a de facto life sentence." VRP (Jan. 21, 2022) at 2302. But the trial court failed to remove the felony murder conviction from one portion of the judgment and sentence.

Thompson appeals his convictions and seeks to strike his legal financial obligations and correct his judgment and sentence.

ANALYSIS

I. GR 37

Thompson argues that the trial court erred by allowing the State to exercise a peremptory challenge against juror 35. Thompson says that juror 35 was removed because her answers were "'unintelligent or confused.'" Br. of Appellant at 47 (quoting GR 37(i)). He asserts that "both a focus on youth and 'unintelligent or confused answers' are historically associated with improper discrimination in jury selection." Reply Br. of Appellant at 2 (quoting GR 37(i)). He emphasizes that only one other prospective juror got the same number of questions from the prosecutor. Moreover, the trial court said an objective observer "would not" view race as a factor, applying the wrong standard. Br. of Appellant at 49. Thompson asserts that an objective observer *could* view race as a factor in the State's peremptory challenge, requiring reversal. We disagree.

A.        Standard of Review

The state and federal constitutions guarantee criminal defendants the right to trial by an impartial jury. U.S. CONST. amend. VI; WASH. CONST. art. I, §22. "Furthermore, prospective jurors themselves have the constitutional right not to be excluded from serving on a jury due to discrimination." *State v. Orozco*, 19 Wn. App. 2d 367, 373, 496 P.3d 1215 (2021).

GR 37 is intended "to eliminate the unfair exclusion of potential jurors based on race or ethnicity." GR 37(a). Courts have generally applied a de novo standard of review in this context. *See, e.g., State v. Harrison*, 26 Wn. App. 2d 575, 582, 528 P.3d 849 (2023); *State v. Listoe*, 15 Wn. App. 2d 308, 321, 475 P.3d 534 (2020); *State v. Omar*, 12 Wn. App. 2d 747, 750-51, 460 P.3d 225 (2020). The Washington Supreme Court has explained that de novo review is appropriate when "there were no actual findings of fact and none of the trial court's determinations apparently depended on an assessment of credibility." *State v. Tesfasilasye*, 200 Wn.2d 345, 356, 518 P.3d 193 (2022). However, the Supreme Court has left "further refinement of the standard of review open for a case that squarely presents the question based on a well-developed record." *Id*.

This court has declined to hold that de novo review applies in all circumstances in GR 37 cases. *State v. Hale*, 28 Wn. App. 2d 619, 628-29, 537 P.3d 707 (2023). We have explained that jury selection determinations "often rely on subtleties in human interactions that are absent from a cold written record." *Id* at 629. Jurors' and attorneys' demeanor, body language, voice inflections, and other nuances "may affect whether an objective observer could view race as a factor for a peremptory challenge." *Id*. "[T]rial courts are in the best position to evaluate jurors because they can observe the jurors' demeanor." *Id*.; *see, e.g.*, *State v. Davis*, 175 Wn.2d 287, 312,

290 P.3d 43 (2012), *abrogated on other grounds by State v. Gregory*, 192 Wn.2d 1, 427 P.3d 621 (2018); *State v. Lawler*, 194 Wn. App. 275, 282, 374 P.3d 278 (2016).

The concurrence/dissent suggests that de novo review in all GR 37 cases is necessary to effectuate the Washington Supreme Court's open letter challenging all of us to eliminate racism from Washington's justice system. Concurrence/dissent at 1 (quoting Letter from Wash. State Sup. Ct. to Members of Judiciary & Legal Cmty. 2 (June 4, 2020)).[3] But applying abuse of discretion review in at least some GR 37 cases would not defeat the purposes of GR 37 or the Washington Supreme Court's letter. Appellate courts can and should find abuse of discretion where we can see on the record that a trial court decision is a result of bias or that a trial court allows use of a peremptory challenge motivated by bias. Analyzing these decisions under a de novo standard is not only inconsistent with the GR 37 standard itself, but it could actually shield these decisions from the daylight we must shine on our justice system. Indeed, calling such decisions anything other than abuse of discretion would defeat the purpose of the Washington Supreme Court's letter.

Here, we affirm under either the de novo standard or a more deferential one.

B.    GR 37 Analysis

GR 37(d) requires a party to articulate the reasons for their peremptory challenge once there has been an objection to the challenge under the rule. The trial court "shall then evaluate the reasons given to justify the peremptory challenge in light of the totality of circumstances. If the court determines that an objective observer *could* view race or ethnicity as a factor in the use of the peremptory challenge, then the peremptory challenge shall be denied." GR 37(e) (emphasis

---

[3] https://www.courts.wa.gov/content/publicUpload/Supreme%20Court%20News/Judiciary%20Legal%20Community%20SIGNED%20060420.pdf [https://perma.cc/QNT4-H5P7].

added). "For purposes of this rule, an objective observer is aware that implicit, institutional, and unconscious biases, in addition to purposeful discrimination, have resulted in the unfair exclusion of potential jurors in Washington State." GR 37(f).

In making its determination, the court "should consider" circumstances including "the number and types of questions posed to the prospective juror," as compared to the number and types of questions asked of other jurors; whether other prospective jurors provided similar answers but were not the subject of a peremptory challenge; whether a reason might be disproportionately associated with a race or ethnicity; and whether the party has used peremptory challenges disproportionately against a given race or ethnicity, in the present case or in past cases. GR 37(g)(i)-(v). There are seven presumptively invalid justifications for peremptory challenges, including the juror having prior contact with law enforcement or not being a native English speaker, for example. GR 37(h)(i)-(vii). The rule also lists several reasons that "have historically been associated with improper discrimination in jury selection," including that the juror was sleeping or inattentive, exhibited a problematic attitude or body language, "or provided unintelligent or confused answers." GR 37(i). When a trial court erroneously allows a peremptory challenge over a GR 37 objection, the remedy is a new trial. *See Listoe*, 15 Wn. App. 2d at 329.

The Supreme Court has emphasized that the test is whether an objective observer *could* view race as a factor in a peremptory challenge, not whether an objective observer *would* view race as a factor. *Tesfasilasye*, 200 Wn.2d at 357. "Under the 'could view' standard, a judge is required to deny a peremptory challenge when the effect is discriminatory regardless of whether there was discriminatory purpose. The 'could view' standard is also more likely to prevent peremptory dismissals of jurors based on the unconscious or implicit biases of lawyers." *Id.*

20

(citation omitted). We note, however, that in *Tesfasilasye,* the trial court's application of an incorrect "would view" standard did not by itself warrant reversal; the Supreme Court recognized that the trial court applied a "would view" standard and went on to determine for itself whether an objective observer "could view" race as a factor in the peremptory challenges at issue in that case. *Id.* at 355, 359-61.

This court has held that an objective observer could view race as a factor when the State exercised peremptory challenges against all three prospective jurors who "exhibited an awareness of racial justice issues when a Black defendant was on trial." *Harrison*, 26 Wn. App. 2d at 582. And Division Three has held that an objective observer could view race as a factor in the State's peremptory strike of a young Asian American juror. *State v. Lahman*, 17 Wn. App. 2d 925, 937, 488 P.3d 881 (2021). But in that case, the juror's "statements during voir dire did not differ markedly from those of other prospective jurors" and the prosecutor received limited information from the juror "largely due to the fact that [the juror] was asked few questions." *Id*. The prosecutor's explanation for striking the juror focused on his youth and lack of life experiences, not his specific responses to any questions, which "played into at least some improper stereotypes about Asian Americans, particularly given the lack of any record about the relative ages of other jurors." *Id*. at 937-38.

Here, while it is true that the trial court appears to have misstated the standard as "would view," applying the correct "could view" standard, an objective observer could not conclude that race was a factor in the peremptory strike against juror 35.

Relying in part on *Lahman*, Thompson argues that the prosecutor improperly focused on juror 35's youth, and he asserts that the prosecutor and the trial court essentially characterized juror

35's answers as "'unintelligent or confused,'" which has "'historically been associated with improper discrimination in jury selection.'" Br. of Appellant at 47 (quoting GR 37(i)). But juror 35's answers were not unintelligent or confused, and the prosecutor's and trial court's discussion of them was far more specific than in *Lahman*. Although her answers on the jury questionnaire led defense counsel to inquire further, during voir dire, she clearly and succinctly stated that she expected to form her own opinion based on the evidence but would be able to change her opinion if sufficiently convinced. While the trial court specifically noted that juror 35's answers about memory reflected immaturity and were unrealistic, the court did not imply that juror 35 was generally unintelligent.

Further, unlike the young juror in *Lahman*, both parties questioned juror 35 extensively, and her answers differed from other jurors. Juror 35 repeatedly expressed a belief that two years—the same gap between the charged events and the trial—would not degrade her memory of events, and she did not think that witnesses should have a problem remembering events from two years before. In contrast, the State asked similar questions throughout voir dire, and all other jurors who answered the same question were aware that memory and perception can differ among individuals and with passage of time.

It is true that the State asked only one other juror, juror 43, the same number of questions as juror 35 (17 questions), but defense counsel asked juror 35 a total of 23 questions. And while Thompson contends that juror 43 provided "similar answers" to juror 35, those answers related only to each juror's ability to describe cars in detail because both liked cars. The State's other questions related to juror 35's insistence that passage of time should not affect memory, which

was the stated basis of the State's challenge. This, without more, could not prompt an objective observer to think that race was a factor in the peremptory challenge against juror 35.

The State's other peremptory challenges focused on young jurors. Moreover, five seated members of the jury were Indigenous or people of color, including two who the court and counsel agreed appeared to be of African American descent. And Thompson does not and could not assert that the State disproportionately exercised peremptory challenges against any race or ethnicity in this case.

Viewing all of the circumstances, an objective observer could not view race as a factor in the State's peremptory challenge against juror 35, under either a deferential standard in light of the trial court's ability to objectively observe the prosecutor's and jurors' demeanor or a de novo review standard. The trial court did not err by denying the GR 37 challenge.

## II. EVIDENTIARY ISSUES

### A.     SWAT Evidence

Thompson argues that he received ineffective assistance when defense counsel failed to move to exclude, object to, or seek a curative instruction for testimony about SWAT involvement in Thompson's arrest. He asserts that the testimony was inflammatory and irrelevant and that any objection would have been sustained. And he insists that there was no legitimate tactical reason for counsel to not object or request a curative instruction. Thompson argues that he was prejudiced because the testimony "shifted the jury's attention to Thompson's general propensity for violence" and "allowed the jury to speculate as to Thompson's propensity for criminality." Br. of Appellant at 62. We disagree.

A defendant claiming ineffective assistance must show both that counsel performed deficiently and that counsel's performance prejudiced the defendant. *State v. Grier*, 171 Wn.2d 17, 32-33, 246 P.3d 1260 (2011). The failure to demonstrate either prong of the test will end our inquiry. *State v. Classen*, 4 Wn. App. 2d 520, 535, 422 P.3d 489 (2018). To establish prejudice, the defendant must show "a reasonable probability that, but for counsel's deficient performance, the outcome of the proceedings would have been different." *State v. Kyllo*, 166 Wn.2d 856, 862, 215 P.3d 177 (2009). "'A reasonable probability is a probability sufficient to undermine confidence in the outcome.'" *In re Pers. Restraint of Yates*, 177 Wn.2d 1, 36, 296 P.3d 872 (2013) (quoting *Strickland v. Washington*, 466 U.S. 668, 694, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984)).

The State's reason for testimony about Thompson's arrest was to establish ownership of the phone found near him in the van he was riding in. But the detailed testimony about the procedure for his arrest by a SWAT team was irrelevant and unnecessarily emphasized Thompson's perceived dangerousness. Although defense counsel's questions on cross-examination about the frequency of SWAT arrests may have been intended to mitigate the damage, they in fact inflamed it further by allowing the officer to testify that they consider a "suspect's past, arrest history, and past crimes" before ordering a SWAT arrest. VRP (Sept. 16, 2021) at 1363-64. Though the trial court offered to give a curative instruction, defense counsel decided not to propose one to avoid drawing more attention to the testimony.

We note that the trial court felt it necessary to sua sponte interrupt testimony to halt the discussion of SWAT's involvement in the arrest. But even assuming defense counsel performed deficiently by failing to object, Thompson cannot show prejudice.

24

There was overwhelming evidence that Thompson committed the murders, robbery, and assaults. Counsel admitted in closing that Thompson participated in the robbery and he was guilty of felony murder of Soon Ja. Counsel also conceded Thompson was guilty of second degree unlawful possession of a firearm and conspiracy to commit a robbery. Moreover, there was a significant amount of evidence that Thompson was the shooter in both murders. The customer who walked in on the robbery testified that the man wearing black and carrying the gun was noticeably larger and heavier than the man in blue who walked out of the store. And the jury received evidence that Thompson was several inches taller and at least 35 pounds heavier than Thuo, and it was Thuo who was wearing the blue sweatshirt that day. The customer also testified that Thompson pointed the gun at him when he tried to intervene.

Next, there was extensive evidence that Thompson possessed the .380 Taurus handgun that killed both Soon Ja and Thuo before the robbery and he tried to sell the gun after Thuo's murder. Meanwhile, multiple family members testified that Thuo had never owned a gun. Further, Thompson's girlfriend testified that he planned to kill Thuo to keep him quiet, and Thompson later confessed to her unique details of the crime that could be confirmed only by autopsy, such as that Thompson wrapped the gun in a bag to reduce gunshot residue. Two witnesses' testimony about SWAT involvement in Thompson's arrest, which did not reveal any prior criminal history and was not revisited during closing, was comparatively fleeting in the context of a four-week trial with approximately 50 witnesses.

Thus, there is not a reasonable probability that the outcome of the trial would have been different had counsel objected or sought a curative instruction. We hold that Thompson did not receive ineffective assistance of counsel.

B.     Other Suspect Evidence

Thompson next asserts that the trial court violated his right to present a defense by excluding cell phone data that placed other people at the marina the night of Thuo's murder. He reasons that the evidence "was highly relevant to the thoroughness of the police investigation and whether Thompson in fact committed the murder." Br. of Appellant at 67. Thompson insists that there was an adequate nexus between the other suspects and Thuo's murder such that the cell phone evidence created a reasonable doubt about Thompson's guilt. Thompson contends that exclusion of the evidence was not harmless beyond a reasonable doubt, requiring reversal. We disagree.

A criminal defendant's right to present a defense includes "the rights to examine witnesses against him and to offer testimony." *State v. Castro DeJesus*, 7 Wn. App. 2d 849, 865, 436 P.3d 834 (2019). A defendant has the right to offer evidence that someone else committed the charged crime if the evidence is relevant, which means that it tends to connect someone other than the defendant with the charged crime. *State v. Franklin*, 180 Wn.2d 371, 381, 325 P.3d 159 (2014). "We review a trial court's decision to exclude other suspect evidence for abuse of discretion." *State v. Wade*, 186 Wn. App. 749, 765, 346 P.3d 838 (2015). And if admissible other suspect evidence was erroneously excluded, the error is subject to constitutional harmless error analysis. *Franklin*, 180 Wn.2d at 383.[4]

To be relevant and admissible, other suspect evidence must have a "logical connection to the crime." *Id.* at 381. Circumstantial evidence of another suspect may be admissible, and a trial

---

[4] We note that the State argues there was not a sufficient offer of proof to establish exactly what Thompson's other suspect evidence was. But the record is sufficient to conclude that Thompson would have offered cell phone location evidence establishing that at least one of Thompson's friends was also at or near the marina on the night Thuo was killed.

court cannot exclude other suspect evidence based on the strength of the State's case. *Id*. at 381. But overall, "[e]vidence establishing nothing more than suspicion that another person might have committed the crime [is] inadmissible." *Id*. at 380.

In *Franklin*, the defendant was dating two women; he lived with one of them, and she disapproved of his relationship with the other woman. *Id*.at 373. Franklin was charged with cyberstalking the second woman based on Craigslist ads and harassing e-mails. *Id*. at 376. Franklin asserted that his live-in girlfriend had posted the ads and sent the e-mails, based on the fact that his personal laptop was the only computer in their home, the live-in girlfriend had access to his e-mail, and she had sent threatening messages to the victim before. *Id*. The trial court excluded the other suspect evidence and the Supreme Court reversed. *Id*. at 377.

In explaining the other suspect standard, the *Franklin* court distinguished *State v. Downs,* 168 Wash. 664, 13 P.2d 1 (1932). "The defendants in *Downs* offered evidence that a potential suspect—the apparently infamous burglar '"Madison Jimmy"'—was in town at the time the charged burglary was committed. There was no evidence actually connecting Madison Jimmy in any way to the particular burglary." *Franklin*, 180 Wn.2d at 379 (citation omitted) (quoting *Downs*, 168 Wash. at 666). The Supreme Court explained that mere evidence of another person's motive or opportunity, "'or motive coupled with threats of such other person, is inadmissible, unless coupled with other evidence tending to connect such other person with the actual commission of the crime charged.'" *Id.* (quoting *State v. Kwan,* 174 Wash. 528, 533, 25 P.2d 104 (1933)).

Here, Thompson would not name which of the several other people who were allegedly at the marina had shot Thuo. The cell phone evidence that Thompson sought to admit would have only placed at least one of those people at the marina. Thompson offered no other evidence or

testimony about motive or access to the murder weapon, for example. Any link to the actual murder based solely on location was purely speculative.

Similarly, with regard to the police investigation, a detective testified that police contacted four known associates of Thompson, who did not cooperate with the investigation. And Thompson testified that other people besides himself and Thuo were at the marina, although he would not say who, and his girlfriend corroborated this testimony. Opportunity for someone else to have committed the murder, by itself, does not render other suspect evidence admissible without an adequate nexus connecting the specific individual to the charged crime.

We hold that the trial court did not abuse its discretion by excluding the other suspect evidence. And for all of these reasons, the trial court's exclusion of cell phone location information did not deprive Thompson of a defense.

### III. PROSECUTORIAL MISCONDUCT

In opening arguments, the prosecutor explained that Thompson's actions affected "a child from Kenya, a Korean-American couple who kept a shop in Puyallup for decades, [and a] Latino contractor out buying beverages for a family get-together." VRP (Sept. 8, 2021) at 39. The prosecutor made similar comments in closing about how Thompson's gun connected a diverse group of people.

Thompson contends that these references to the ethnic backgrounds of the victims amounted to prosecutorial misconduct. Thompson asserts that the prosecutor "appealed to the passions and prejudices of the jury by emphasizing the ethnicities of the complaining witnesses to garner sympathy and invited the jury to send a message by holding Thompson accountable." Br. of Appellant at 77. Thompson argues that referring to the victims' race or ethnicities was irrelevant

and done only "to evoke racial biases and sympathies." *Id.* at 83. And he insists that the misconduct was so flagrant and ill-intentioned that an instruction would not have cured any prejudice. He also argues that defense counsel rendered ineffective assistance by failing to object or seek a curative instruction. We disagree.

When a defendant objected to the prosecutor's remarks at trial, the defendant must show both that the remarks were improper, and that there is a substantial likelihood the misconduct affected the jury's verdict. *State v. Emery*, 174 Wn.2d 741, 760, 278 P.3d 653 (2012). If the defendant did not object, then they have waived their claim unless they also demonstrate that the remarks were flagrant and ill-intentioned and that a curative instruction could not have neutralized the prejudice. *Id.* at 760-61.

Although there is a different standard for appeals to racial bias, the Washington Supreme Court has also acknowledged that "not all express mentions of race will carry the danger of appealing to jurors' potential racial bias." *State v. Zamora*, 199 Wn.2d 698, 715, 512 P.3d 512 (2022). For example, in prosecuting race-based hate crimes, "race or ethnicity may be relevant or even necessary to discuss within the context of trial." *Id*. More specifically, the different standard "applies only when a prosecutor mentions race in an effort to appeal to a juror's potential racial bias, i.e., to support assertions based on stereotypes rather than evidence." *In re Pers. Restraint of Sandoval*, 189 Wn.2d 811, 834, 408 P.3d 675 (2018).

Here, the prosecutor never mentioned *Thompson's* race or ethnicity during opening or closing arguments. Thompson insists that the prosecutor's comments about the ethnic backgrounds of the victims were intended to invoke racial *sympathies*, not anti-Black or anti-Korean or anti-Latino prejudices.

The jury heard testimony that the Nams were from Korea and that Soon Ja preferred to speak Korean when emotional or excited. The jury could infer that she may have asked Joseph to open the cash register in Korean, which Thompson would not have understood, possibly contributing to his decision to shoot her. Thuo's Kenyan background was relevant to testimony from his cousin, who had recently moved from Kenya and shared a room with Thuo. The prosecutor's brief comments about their backgrounds were based on evidence and reasonable inferences in the record. And while the ethnicity of the customer who walked in on the robbery was not relevant to any testimony, the references to his ethnicity were fleeting and fit within the State's purpose of emphasizing how the crimes affected people from varied backgrounds. *See State v. Bagby*, 200 Wn.2d 777, 794, 522 P.3d 982 (2023). These comments did not "flagrantly or apparently intentionally appeal[] to racial bias in a way that undermine[d] the defendant's credibility or the presumption of innocence." *State v. Monday*, 171 Wn.2d 667, 680, 257 P.3d 551 (2011). Thus, the different test for race-based prosecutorial misconduct does not apply.

Similarly, under the standard prosecutorial misconduct test, because the statements were based on the evidence and for the most part relevant to the State's theory of the case, they were not improper, much less flagrant or ill-intentioned. *Emery*, 174 Wn.2d at 760-61.

Thompson also argues that the prosecutor's comments about how the crimes affected a wide array of people inflamed the jury's passions and prejudices and invited them to hold him accountable. Prosecutors overstep in closing argument if they argue facts that are not in the record or improperly appeal to the passions and prejudices of the jury. *State v. Pierce*, 169 Wn. App. 533, 553, 280 P.3d 1158 (2012). But a "'prosecutor is not muted because the acts committed arouse natural indignation.'" *State v. Borboa*, 157 Wn.2d 108, 123, 135 P.3d 469 (2006) (quoting *State v.*

*Fleetwood*, 75 Wn.2d 80, 84, 448 P.2d 502 (1968)). In this case, Thompson murdered a 79-year-old woman by shooting her in the back, robbed her elderly husband, pointed a gun at a bystander who tried to intervene, then killed a fellow 16-year-old boy by shooting him in the back of the head to keep him from talking to police. The prosecutor's brief statements referring to people from many different walks of life were not improper or prejudicial. *Emery*, 174 Wn.2d at 760-61. For the same reasons, counsel did not render ineffective assistance by failing to object.

Thompson argues that cumulative errors prejudiced him and require a new trial. Because we find no error, the cumulative error doctrine does not apply.

IV. SUFFICIENCY OF THE EVIDENCE

Thompson was charged with second degree assault of Joseph with two alternative means: assault with a deadly weapon and assault with intent to commit a felony. The jury instructions allowed the jury to convict Thompson of second degree assault of Joseph as long as each individual juror believed that Thompson either assaulted Joseph with a deadly weapon or assaulted him with intent to commit a robbery; no unanimity as to means was required. When a jury is instructed that it may convict on either of two alternative means of committing a crime without being unanimous on which means, there must be sufficient evidence to support a conviction under each means. *State v. Owens*, 180 Wn.2d 90, 99, 323 P.3d 1030 (2014).

Thompson argues that there is insufficient evidence to support one of the alternative means of committing second degree assault against Joseph, assault with a deadly weapon. This means requires proof Thompson intended to create, and created, apprehension and fear of bodily injury in Joseph with a deadly weapon. Thompson emphasizes that Joseph did not testify at trial and "[t]here was no evidence that Thompson or an accomplice ever directed a gun" at him. Br. of

Appellant at 93. Thus, he asserts that the only way for the jury to convict him of second degree assault of Joseph was through speculation. We disagree.

The test for sufficiency of the evidence is whether any rational trier of fact could find the elements of the crime beyond a reasonable doubt when viewing the evidence in a light most favorable to the State. *State v. Dreewes*, 192 Wn.2d 812, 821, 432 P.3d 795 (2019). "A claim of insufficiency admits the truth of the State's evidence and all inferences that reasonably can be drawn therefrom." *State v. Salinas*, 119 Wn.2d 192, 201, 829 P.2d 1068 (1992). Circumstantial and direct evidence are equally reliable. *State v. Cardenas-Flores*, 189 Wn.2d 243, 266, 401 P.3d 19 (2017). And we defer to the fact finder's resolution of conflicting testimony and evaluation of the evidence's persuasiveness. *State v. Homan*, 181 Wn.2d 102, 106, 330 P.3d 182 (2014).

To convict a defendant of second degree assault, a jury must find that the defendant intended "either to create apprehension of bodily harm or to cause bodily harm," and that the victim actually experienced a reasonable apprehension of injury. *State v. Byrd*, 125 Wn.2d 707, 712-13, 887 P.2d 396 (1995). No bodily injury is required. *Id*. at 710, 712. There are several alternative means of committing second degree assault, including assaulting a person with a deadly weapon or with intent to commit a felony. RCW 9A.36.021(1)(c), (e). A loaded or unloaded firearm is a deadly weapon. RCW 9A.04.110(6).

Thompson relies on Division One's opinion in *In re Personal Restraint of Arntsen*, where after a road rage incident, the defendant approached the victim's car while holding a rifle "without ever pointing the rifle at her," then returned to his own vehicle and left. 25 Wn. App. 2d 102, 117, 522 P.3d 135 (2023). The victim testified that she thought Arntsen meant to do her harm but did not know what kind. *Id*. at 118. Division One reversed Arntsen's conviction for second degree

assault because "the evidence did not sufficiently allow the jury, without speculating, to find" that Arntsen intended to create a fear of bodily injury in the victim, in part because he never pointed the gun at the victim. *Id*. But the Supreme Court recently reversed Division One's decision. *In re Pers. Restraint of Arntsen*, 2 Wn.3d 716, 543 P.3d 821 (2024).

The Supreme Court concluded that a jury could infer that Arnsten intended to make the victim fear injury when he "approached [the victim] with his AK-47 after swerving and nearly colliding with her car and forcing her to an abrupt stop in the middle of the road." *Id*. at 726. And the victim's testimony that she "thought Arntsen must have had the rifle in order to use it, either to shoot her or to harm her in some other way" would support an inference that the victim reasonably feared bodily injury. *Id*. "While Washington courts have often recognized that pointing a gun is sufficient to show specific intent for assault, we have never held that it is necessary." *Id*. at 729.

The instructions in this case explained that an "assault" is "an act done with the intent to create in another apprehension and fear of bodily injury, and which in fact creates in another a reasonable apprehension and imminent fear of bodily injury." CP at 103.

It is true that Joseph did not testify, and there was no direct testimony that he reported feeling fear or apprehension that he would be injured. There was also no testimony that Thompson ever pointed a gun at Joseph. But taking the evidence and drawing all reasonable inferences in favor of the State, a rational trier of fact could infer that Thompson's conduct in this case was intended to and did create fear and apprehension that Thompson would also harm Joseph. A reasonable jury could find that Thompson intended to create an apprehension of bodily injury in Joseph when Thompson shot Joseph's wife in front of him after she asked Joseph to open the cash

register. Even though there was no testimony that Thompson pointed the gun at Joseph, Joseph was fully aware that Thompson had a gun, based on his warning to the customer who tried to intervene. And a reasonable jury could find that Joseph's actions of complying with the robbery instead of resisting or tending to his critically injured wife, who had collapsed on the floor in front of him after being shot, showed that he experienced a reasonable apprehension of bodily injury. Joseph was extremely concerned about Soon Ja after the danger had passed, so his actions in the moment of complying with the robbery instead of tending to his fatally injured wife support an inference that Joseph experienced reasonable apprehension of bodily injury.

We hold that sufficient evidence supported Thompson's conviction for second degree assault of Joseph.

## V. SENTENCING ISSUES

### A. Scrivener's Error

Thompson asserts, and the State concedes, that his judgment and sentence includes the conviction for first degree felony murder of Soon Nam even though the trial court vacated that conviction on double jeopardy grounds. The remedy for a scrivener's error is to remand to the trial court to correct the judgment and sentence. *State v. Makekau*, 194 Wn. App. 407, 421, 378 P.3d 577 (2016). We accept the State's concession and remand for the trial court to correct the error.

### B. Legal Financial Obligations

Finally, Thompson argues, and the State concedes, that we should remand for the trial court to strike the community custody supervision fees, the DNA collection fee, and the crime victim penalty assessment from Thompson's judgment and sentence. Trial courts may no longer impose community custody supervision fees or the crime victim penalty assessment on indigent

defendants, or the DNA fee on any defendant, and the laws took effect while Thompson's case was still pending on appeal. LAWS OF 2022, ch. 29, § 8(2)(d); LAWS OF 2023, ch. 449, §§ 1(4), 4; *State v. Ellis*, 27 Wn. App. 2d 1, 16-17, 530 P.3d 1048 (2023). We accept the State's concession and remand for the trial court to strike the community custody supervision fees, DNA collection fee, and crime victim penalty assessment.

## CONCLUSION

We affirm Thompson's convictions. But we accept the State's concessions and remand for the trial court to correct the scrivener's error and strike the community custody supervision fees, DNA collection fee, and crime victim penalty assessment from Thompson's judgment and sentence.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

Glasgow, J.

I concur:

Price, J.

No. 56625-7-II

VELJACIC, A.C.J. (concurring in part, dissenting in part)—I agree with my colleagues in the majority in nearly all aspects, including agreement with the conclusion in the review of the GR 37 challenge. But I disagree that a deferential standard of review should be applied to GR 37 challenges. GR 37 matters should be reviewed under a de novo standard of review "because the appellate court 'stand[s] in the same position as does the trial court' in determining whether an objective observer could conclude that race was a factor in the peremptory strike." *State v. Tesfasilasye*, 200 Wn.2d 345, 355-56, 518 P.3d 193 (2022) (quoting *State v. Jefferson*, 192 Wn.2d 225, 250, 429 P.3d 467 (2018)). De novo review of GR 37 challenges better ensures fidelity to the principles underlying GR 37 and is integral to ensuring justice is done in our courts. As judges, we can only be better by "lean[ing] in to do this hard and necessary work" of "carefully reflecting on our actions." Letter from Wash. State Sup. Ct. to Members of Judiciary & Legal Cmty. 2 (June 4, 2020), https://www.courts.wa.gov/content/publicUpload/Supreme%20Court%20News/Judiciary%20Legal%20Community%20SIGNED%20060420.pdf [https://perma.cc/QNT4-H5P7].

_____
Veljacic, A.C.J.

36